## STATE v. SOLOMAN et al.

No. 5829.    Decided August 23, 1937.    (71 P. [2d] 104.)

*Harry G. Metos,* of Salt Lake City, for appellants.

*Joseph Chez,* Atty. Gen., and *Zelph S. Calder,* Deputy Atty. Gen., for the State.

FOLLAND, Chief Justice.

Defendants Ralph Solomon, James Woolman, W. D. Allen, Dave Sinclair, and Orson Shelley were convicted of riot and appeal. On August 21, 1935, a short time before the hour of 10 a. m., a group of unemployed men and women met at the Salt Lake County Emergency Relief Administration headquarters in Salt Lake City, Utah. A committee of ten persons representing different sections of the county had been selected to meet the person at the head of the relief administration and to present a protest against a recent cut in the amount of money allocated to the unemployed. Word was taken to the administrator that a committee of ten was desirous of waiting on him. He thereupon sent word back that he would receive a committee of five but not of ten. The persons on the outside of the building held a meeting in

which they discussed the matter and there is some evidence that the committee was reduced to eight. At any rate, a reduction to five was not made. The committee and many of its supporters then went into the building and immediately thereafter the doors were closed and there was a great deal of scuffling and use of sticks and clubs between the unemployed, on the one side, and police and sheriff's officers and relief administration employees on the other. The relief administration people were fully aware that a demonstration would be made by the unemployed because handbills had been previously circulated to that effect. The police and sheriff's officers had been informed of this and a number of officers were present in the administration building. The evidence of the State tended to show that the committee and its supporters commenced the use of force and violence by forcing their way into the building, by pushing aside and striking the persons therein, and by throwing of missiles against the windows and doors breaking them. The testimony of defendants tended to show that the committee was firm but peaceful in its demands and that force was first used by the officers of the law.

The assignments of error present four questions: (1) Status of the bill of particulars under the new short-form information law; that is, must it be read to the jury as part of the information; (2) what, if any, offenses are necessarily included in the charge of riot; (3) rulings on the admission and exclusion of evidence; and (4) whether certain statements of the court and the district attorney were prejudicial.

At the trial, after the jury was impaneled, the court directed the clerk to read the information and state the defendants' pleas to the jury. This was done. The defendants requested the court to direct the clerk to read the bill of particulars to the jury as part of the information. The court refused so to do and this is assigned as error. The statute in 1935, by amendment to the code of criminal procedure, provided for the so-called short-form of information or indictment. Section 105-21-6, Rev. St. Utah 1933, as amended by

chapter 118, Laws Utah 1935. Section 105-21-8, (as amended by Laws 1935, c. 118) reads:

"(1) The information or indictment may charge, and is valid and sufficient if it charges the offense for which the defendant is being prosecuted in one or more of the following ways:

"(a) By using the name given to the offense by the common law or by a statute.

"(b) By stating so much of the definition of the offense, either in terms of the common law or of the statute defining the offense or in terms of substantially the same meaning, as is sufficient to give the court and the defendant notice of what offense is intended to be charged.

"(2) The information or indictment may refer to a section or subsection of any statute creating the offense charged therein, and in determining the validity or sufficiency of such information or indictment regard shall be had to such reference."

The crime of riot is defined by section 103-50-2, Rev. St. 1933, as follows:

"Any use of force or violence disturbing the public peace, or any threat to use such force or violence, if accompanied by immediate power of execution, by two or more persons acting together and without authority of law is a riot."

The information in this case charged the crime as follows:

"That the said Ralph Solomon, James Woolman, W. D. Allen, George Shay, Frank Martin, Dave Sinclair, Orson Shelley, John Doe Smith, on the 21st day of August, A. D. 1935, at the County of Salt Lake, State of Utah, acting together and concertedly, did without authority of law, willfully, unlawfully, and feloniously use and threaten to use force and violence in disturbing the public peace, said threat being then and there accompanied by immediate power of execution. * * *"

The information was fully as complete as required by the statute. The language used in the information included all elements of the crime so that each defendant was fully informed as to the "nature and cause of the accusation against him," as required by the Constitution, art. 1, § 12.

Under the amended statute, the court must order the district attorney to deliver to the defendant, and to file, a bill of particulars where one is demanded and is necessary for certain purposes. The statute (Rev. St. 1933, 105-21-9, as amended by Laws 1935, c. 118) provides:

"(1) When an information or indictment charges an offense in accordance with the provisions of section 105-21-8, but fails to inform the defendant of the particulars of the offense, sufficiently to enable him to prepare his defense, or to give him such information as he is entitled to under the constitution of this state, the court may, of its own motion, and shall at the request of the defendant, order the prosecuting attorney to furnish a bill of particulars containing such information as may be necesary for these purposes; or the prosecuting attorney may of his own motion furnish such bill of particulars.

"(2) When the court deems it to be in the interest of justice that facts not set out in the information or indictment or in any previous bill of particulars should be furnished to the defendant, it may order the prosecuting attorney to furnish a bill of particulars containing such facts. In determining whether such facts and, if so, what facts, should be so furnished, the court shall consider the whole record and the entire course of the proceedings against the defendant.

"(3) Supplemental bills of particulars or a new bill may be ordered by the court or furnished voluntarily under the conditions above stated.

"(4) Each supplemental bill shall operate to amend any and all previous bills and a new bill shall supersede any previous bill.

"(5) When any bill of particulars is furnished it shall be filed of record and a copy of such bill be given to the defendant."

The granting of the bill of particulars is not discretionary with the court as it was at common law, but is a right which the defendant can demand and which the court must grant if the statutory conditions are present. It is the contention of defendants that the bill of particulars is in substance, a part of the information since it supplied certain particulars with respect to the crime charged which had not been stated in the information. The bill of particulars in this case was as follows:

"That the above named defendants, and each of them, on the 21st day of August, 1935, at approximately the hour of 10 o'clock a. m.,

assembled in the vicinity of that certain building in which the Salt Lake County Emergency Relief Administration offices are located, the address being 2236 Highland Drive, Salt Lake City, Salt Lake County, State of Utah.

"That said defendants, together with William Smith and James Solomon, and divers other persons whose names are unknown at said time and place did then and there disturb the public peace, in that they did use and engage in threatening and boisterous language and conduct, and did by means of force and violence break and enter said building, and did then and there by the use of hands, fists, feet, rocks, bricks, and clubs, bear and batter police officers of Salt Lake City Corporation, deputy sheriffs of Salt Lake County, and employees of the Salt Lake County Emergency Relief Administration who were then and there lawfully in and about said building."

We think it is apparent that the Legislature intended that the bill of particulars should be something distinct from and not subject to the same strict rules as apply to an information or indictment. The bill was to become part of the record (section 105-21-9, subsec. 5, as amended by Laws 1935, c. 118), but not necessarily a part of the information. The chief purpose in prescribing a short-form information was to get away entirely from the needless formalism and verbosity usual in criminal pleadings and the consequent reversals by courts on so-called technical grounds. The pleader had been too often held to strict nicety in stating the elements of the crime and the particulars thereof. The Legislature further intended to fully safeguard the rights of defendants by providing that the court shall direct the filing of a bill of particulars where the information does not give the defendant the particulars of the offense sufficiently to enable him to prepare his defense or give such information as he is entitled to under the Constitution of the state. Many of the salutary purposes motivating the new legislation would be lost if the bill of particulars were treated as a part of the information and subject to the same consideration and legal tests as the information. See *State* v. *Engler*, 217 Iowa 138, 251 N. W. 88; *Hurd* v. *Commonwealth*, 159 Va. 880, 165 S. E. 536; *State* v. *Capaci*, 179 La. 462, 154 So. 419; *People* v. *Bogdanoff*, 254 N. Y. 16, 171 N. E. 890, 69 A. L. R. 1378.

Section 105-32-1, Rev. St. 1933, provides for the clerk to read the information to the jury, as follows:

"(1) If the information or indictment is for a felony, the clerk must read it and state the plea of the defendant to the jury."

This provision was not amended or referred to by any of the amendments to the Code of Criminal Procedure in chapters 116 to 134, Laws of Utah 1935. Notwithstanding the provisions for short-form of information and the right in the defendant to demand a bill of particulars, the Legislature did not see fit to change the statute providing for the reading merely of the information and stating the plea to the jury. This is a statutory requirement and does not rest on any constitutional provision. The constitutional rights of a defendant to "demand the nature and cause of the accusation against him, to have a copy thereof," were fully complied with. No point is now made that the defendants were denied any right or privilege guaranteed by the Constitution. The only point made is that the bill of particulars became part of the information and should have been read to the jury as such. The purpose of reading the information and stating defendant's plea to the jury is in order that the jury may be informed of the nature of the charge and of the issues before it for trial. 16 C. J. 806. This purpose was fully served in the present case.

It is contended by appellants that the court erred in failing to instruct the jury that the offenses of unlawful assembly, disturbing the peace, battery, and assault are included in the charge of riot, and that the defendants, or either of them, might be found guilty of one of such lesser and included offenses. The court instructed merely as to riot and required the jury to find a verdict of guilty or of not guilty of that charge. In a recent case this court held that the crime of unlawful assembly is not an included offense in the crime of riot. *State* v. *Woolman*, 84 Utah 23, 33 P. (2d) 640, 645, 93 A. L. R. 723. The reasons for so holding are fully stated in that opinion and need not be repeated here.

It is sufficient to say that is a well-considered decision and we are not disposed to disturb the principles of law therein decided. The test by which it may be determined whether a lesser offense is included within another offense charged is there stated, as follows:

"The only way this matter may be determined is by discovering all of the elements required by the respective sections, comparing them and by a process of inclusion and exclusion, determine those common and those not common, and, if the greater offense includes all the legal and factual elements, it may safely be said that the greater includes the lesser; if, however, the lesser offense requires the inclusion of some necessary element or elements in order to cover the completed offense, not so included in the greater offense, then it may be safely said that the lesser is not necessarily included in the greater, or, stated otherwise. Can the crime of riot be committed without also committing the crime of unlawful assembly? It may be readily conceded that sufficient allegations may be made in a single information or a single count of an information to cover both offenses; but upon proper attack before verdict two separate offenses may not be charged in one information unless such offenses are by statute expressly permitted to be so joined or included. Comp. Laws Utah 1917, § 8834, Rev. Stat. Utah 1933, 105-21-7; *State* v. *Anderson,* supra [69 Utah 53, 252 P. 280]. * * *

"The statute allows conviction for any lesser offense necessarily included in the offense charged in the indictment or information, but does not allow conviction of any lesser offense stated in the indictment unless it is necessarily included in the greater offense. The lesser offense must be a necessary element of the greater offense and must of necessity be embraced within the legal definition of the greater offense and be a part thereof."

From the definition of riot, it will be seen that the force or violence, or threat of force or violence, may operate against either persons or property, or both. If against property, it is riot as well as if directed against persons, but there could be no assault or battery if the force or violence were directed against property, as, for instance, the breaking of doors or windows, and not against any person. It is true an information may be drawn so as to charge that force and violence were exerted against per-

sons. If we follow the test indicated in the Woolman Case, the lesser offense must necessarily be included in the definition of the offense charged. Neither battery nor assault, therefore, are necessarily included in the crime of riot as defined in the statute. The rule is sound and should be followed.

Usually, and as at common law, the offenses of riot, rout, and unlawful assembly are grouped together, the latter two being included in the first. 2 Wharton on Crim. Law (12th Ed.) 2191. The unlawful assembly is the first step, rout the second and riot the consummated crime. ■ Riot, as defined by our statute, is somewhat different. Unlawful assembly is no part of the offense. *State* v *Woolman,* supra. As defined, riot is a disturbance of the public peace, accomplished by force or violence or a threat of force or violence, accompanied by immediate power of execution, by two or more persons acting together and without authority of law. One person or many may be guilty of disturbing the peace. It is only when two or more act together in disturbing the peace in the manner above specified that it is riot. The minor offense of disturbing the peace is necessarily included in the more serious crime of riot and the jury should have been so instructed. Failure to so instruct on the request of the defendants is error, justifying a reversal of the judgment of conviction.

Under the heading of errors in admission or rejection of evidence, several assignments are argued. A pamphlet marked Exhibit H containing the "Constitution and Regulations of the National Unemployment Council of the U. S. A.," and also a foreword by Herbert Benjamin was introduced in evidence on motion of the State. This is assigned as error. John Nason, chairman of the local unemployment council, was a witness for defendants. It appeared that this council had taken the initiative in organizing the committee and others to call on the relief administration. On redirect examination, Nason was asked the question by counsel for some of the defendants:

"Mr. Nason, Counsel have asked you at considerable length about the Unemployment Council and the term has been used here so frequently, will you tell us something about what the Unemployment Council is?"

The question was objected to by the State and the district attorney and his assistant made statements as follows:

"Mr. Rawlings: The purpose of asking about the Unemployment Council was to determine whether or not they are members of this Council. We do not know what they stand for and we only used the term to identify the group that went down collectively. What they stand for, as Mr. Jenson (Counsel for defendants) said before, doesn't mean anything and it doesn't make any difference what they stand for."

"Mr. Black: What difference does it make what it is? The only purpose is to identify this particular group acting concertedly together this day; not to carry out any plans they had in their by-laws, but to find out what they intended to do to protest. We have asked nothing as to what they believed or stood for, it is immaterial and irrelevant. They might stand for one thing and do another. What we are bound by is what they actually did."

After a great deal of discussion between attorneys, the witness answered, "The Unemployment Council stands for the working people." This was objected to by the assistant district attorney who then suggested that the constitution and by-laws would be the best evidence. After a great deal more discussion and voir dire examination of the witness by the district attorney, the witness, on questions propounded by Mr. Jenson, the attorney for some of the defendants, read an excerpt from the foreword by Mr. Benjamin as succinctly stating the purposes of the organization. Part of the document having been read, under the circumstances above indicated, on questions propounded by defense counsel, the whole document was admitted on offer of the State. From a reading of the record, it would seem that the district attorney first endeavored to keep out of the record all reference to the constitution of the organization of any statement of its purposes or tenets or the beliefs of its members, but later, after part of the foreword had been

read to the jury by defense counsel, the prosecution just as strenuously insisted on having the balance of the pamphlets received. The balance of the document was about as material and relevant as the part quoted. The trial court has a broad discretion in such matters, and, under the circumstances shown, we are convinced its discretion was not abused in permitting the whole document to be introduced.

After the receipt of Exhibit H in evidence, the district attorney went far afield from his original pronouncement wherein he stated, "What they stand for as Mr. Jenson said before, does not mean anything and it does not make any difference what they stand for." He attempted to obtain, from the witness the "beliefs" of the members of the unemployment council, and finally inferred by his questions that the unemployment council was a child of the Communist Party and that some, at least, of its local founders were Communists. Following are some of the questions:

Mr. Black: "Q. Mr. Nason, these Unemployment Councils, and Unemployment Council of Salt Lake County was organized and developed in about 1932, or shortly prior to 1932, under the leadership and direction of the Communist Party of the United States? A. Absolutely not.

"Q. It was not developed under the leadership of the Communist Party?"

This was objected to and assigned as prejudicial error on the ground "counsel is prejudicing the jury against these defendants." Then followed argument and discussion between the attorneys wherein the word "Communist" was frequently used:

Mr. Metos (defense counsel): "Furthermore, we object to counsel's reading from pamphlets with the word 'Communist' on the outside and in full view where the jury can see it—and ask questions from that book."

Mr. Rawlings: "We have not asked any question from that book yet, and we would like the record to show it."

The Court: "Motion denied. It will be permitted to stand as it is."

Mr. Metos: "Note an exception."

Later, after still further discussion wherein the range of talk included beliefs and tenets of the Democratic, Republican, Socialist, and Communist Parties, and of the Mormon and other churches, most of which was wholly irrelevant and immaterial, and all in the presence of the jury, the following question was asked by the district attorney:

Mr. Black: "Who were the organizers of the Unemployment Council of Salt Lake City?"

Over objection, Mr. Nason answered:

"The organizers of the local Unemployment Council was a man by the name of Larson, myself, and quite a few others that I have lost track of at this time.

"Q. Mr. Larson; was that Oscar Larson?   A. Yes sir.

"Q. And he was a Communist?"

Again objection was made and sustained and the conduct of the district attorney assigned as prejudicial.

True, the court sustained objections to these questions and cautioned the district attorney that he was dangerously near the point which might result in a mistrial. Defendants objected to the conduct of the district attorney in asking questions from which the inference might arise that these defendants were associated in some way with Communists, and, characterizing such conduct prejudicial, asked the court to declare a mistrial. This the court refused to do and error is assigned. The first position taken by the district attorney and his assistant as appears from the quotations above made was correct. They should have maintained throughout the trial the same impartial attitude. They must have known that it was wholly irrelevant and immaterial whether the unemployment council was fostered by the Communist Party or whether Oscar Larson, one of the local organizers, was a Communist. The injection of these matters into the case after so much discussion about questions of tenets and beliefs could serve no useful purpose except to arouse prejudice against the defendants with the jury. The question for de-

cision had nothing to do with the beliefs or political affiliations of the founders of the unemployment council. The question was whether these men under charge had committed riot by the unlawful use of force and violence. What mattered it whether an organization to which some, if not all, of them belonged had been fathered by Communists? The defendants would be guilty if they had used unlawful force and violence acting together, and would not be guilty if they had not done so, and this wholly irrespective of their political or economic beliefs, or the beliefs or affiliations of some of the persons who in years past had been instrumental in effecting an organization of the unemployment council.

At one point in the discussion between attorneys, defense counsel objected to the display by the district attorney, in full view of the jury, of a pamphlet with the word "Communist" on the outside, and the asking of questions from the book. The district attorney merely answered that he had not yet asked any questions from the book. The display of Communist literature and the asking of irrelevant and immaterial questions implying Communistic affiliation were highly improper.

Oscar Larson was not a defendant, took no part in the events leading up to the demonstration charged as riot, and what his views were or his party affiliations are matters of no concern whatever. We think the asking of these questions under the circumstances disclosed by this record constituted prejudicial error. 64 C. J. 244; see *State* v. *De Jonge*, 152 Or. 315, 51 P. (2d) 674.

Whether it might not be proper under some circumstances to inquire of a witness whether or not he is a member of a political party or is a believer in certain doctrines, if relevant to any issue or as bearing on credibility, we need not pass on now as that question is not in the case.

Other errors are assigned and argued, but are not of sufficient importance to warrant discussion extending this opinion. They have to do with the conduct of the trial and were fairly within the discretion of the trial court.

The judgment is reversed and the cause remanded to the district court of Salt Lake county for a new trial.

HANSON, MOFFAT, and LARSON, JJ., concur.

WOLFE, Justice (concurring).

As to whether the introduction or rejection of Exhibit H was within the discretion of the trial judge, I make no commitment. I am inclined to think of "discretion of the trial judge" as becoming rather too much of a refuge. But I cannot see that its introduction was prejudicial, it being largely expository of the ideology of a certain group of the working class with touches on the technique of obtaining such objectives.

The State's counsel, having inquired as to whether the defendants were not members of the unemployment council, and counsel for defendants on redirect, fearing perhaps that wrong inferences might be drawn by the jury, sought to elicit information as to the nature of the said council. After obtaining such information from the booklet by reading an excerpt, the subject should have been exhausted unless opposing counsel desired to place excerpts from a booklet in evidence which tended to qualify or further explain the definition of the nature of the unemployment council, if indeed such latter fact was material. But because some one reads a definition or an excerpt out of a book in answer to a question, does not permit the opposite party to introduce the whole book. If a medical expert on the stand should read a definition of a disease from a medical work, it would not permit the other side to introduce the whole volume. The incident furnishes an example of those explorations into collateral or immaterial matters which so often consume time in the trial of a case. By groping in the dark, one may touch something which it is hoped will tend to influence the jury in one's direction. But in this case, I see no prejudicial error in admitting the booklet as a whole.

With the remainder of the opinion, I fully concur.